868 P.2d 1266

Paul GUTIERREZ, Plaintiff–Appellant,

v.

**SUNDANCER INDIAN JEWELRY, INC., Defendant–Appellee.**

No. 13767.

Court of Appeals of New Mexico.

Dec. 16, 1993.

Certiorari Denied Feb. 4, 1994.

---

David Proper, Garcia Law Offices, Albuquerque, for plaintiff-appellant.

David G. Reynolds, Crider, Calvert & Bingham, P.C., Albuquerque, for defendant-appellee.

*OPINION*

BLACK, Judge.

Paul Gutierrez ("Plaintiff") filed a discrimination complaint with the New Mexico Health and Environment Department, Occupational Health and Safety Bureau ("the Bureau"), alleging that he was discharged by Sundancer Indian Jewelry, Inc. ("Defendant") in retaliation for requesting that the Bureau investigate chemical usage and employee health problems at Defendant's workplace. The parties entered into a settlement agreement which was approved by the Bureau on January 11, 1990. On May 14, 1990, Plaintiff filed a complaint in district court seeking damages due to fraud and wrongful

discharge. Defendant filed a motion for partial summary judgment arguing that Plaintiff's sole remedy for his claim of wrongful discharge was through the prior administrative claim brought before the Bureau. Defendant further argued that Plaintiff's claim for wrongful discharge was barred by the doctrine of accord and satisfaction. The district court entered a partial summary judgment holding that the settlement agreement approved by the Bureau settled Plaintiff's claim for wrongful discharge and therefore gave rise to an accord and satisfaction of the wrongful discharge claim set forth in Plaintiff's district court complaint. (Plaintiff voluntarily dismissed his fraud claim.) Plaintiff appeals.

We hold that the record presents questions of material fact precluding summary judgment on Defendant's accord and satisfaction theory; that Plaintiff's complaint states a common-law cause of action for wrongful discharge; and that the New Mexico Occupational Health and Safety Act, NMSA 1978, §§ 50–9–1 to –25 (Repl.Pamp.1988 & Cum. Supp.1992) ("NMOHSA"), does not provide Plaintiff's exclusive remedy.

## I. *FACTS*

Plaintiff originally contacted the Bureau to investigate the possibility that the use of certain chemicals at Defendant's workplace was causing Plaintiff, and other employees, to suffer chest pains and swollen lips. Plaintiff alleged that he was wrongfully discharged for reporting this safety condition.

After an investigation, the Bureau was apparently willing to file a suit on Plaintiff's behalf pursuant to Section 50–9–25. Plaintiff, however, settled the administrative proceeding by agreeing to have all information regarding his termination removed from Defendant's files and requiring that Defendant provide "neutral or better" references to anyone who inquired about Plaintiff's work history. Defendant also agreed to post in conspicuous locations in its workplace copies of a notice stating that Defendant would not discriminate against any employee for exer-

cising such employee's rights under NMOHSA. The settlement further required that Defendant notify the Chief of the Occupational Health and Safety Bureau ("the Bureau Chief") in writing of all steps it had taken to comply with the settlement agreement. Finally, the settlement agreement provided that it was not to be used by Plaintiff or the Bureau as an admission of wrongdoing by Defendant.

Approximately five months after entering into the settlement agreement and terminating the administrative proceeding, Plaintiff filed a complaint in district court seeking damages due to fraud and wrongful discharge. In that complaint, Plaintiff alleged that he was a mechanic by trade and had been lured by Defendant from his mechanic position with promises of more pay and participation in a profit-sharing plan. He claimed that "[a]s a result of Plaintiff contacting OSHA Plaintiff was fired from his position at Sundancer Jewelry." Plaintiff contended that his discharge was wrongful and in violation of his right to seek compliance with safe working practices. In his amended complaint, Plaintiff requested both compensatory and punitive damages against Defendant.

After discovery, Defendant moved for partial summary judgment, arguing that since Plaintiff and Defendant were both parties to a disputed claim before the Bureau, which they had settled, the court could not go beyond the settlement. The district court entered the following findings:

2. Upon finding that Section [50–9–25] has been violated by an employer, OSHA has the power to institute a suit on behalf of the employee to obtain, *inter alia,* back pay and reinstatement of the employee to the job. OSHA itself, however, does not have the authority to adjudicate whether a termination was wrongful for purposes of collateral estoppel or *res judicata.* However, that does not mean that OSHA cannot help the employer and the employee to settle a Section [50–9–25] wrongful discharge claim.

3. The settlement agreement approved by OSHA was between the Plaintiff and the Defendant in this case. What was settled was Plaintiff's original complaint: that he had been discharged for making a complaint to OSHA. That is the same complaint Plaintiff makes in Count II of the Amended Complaint herein.

4. Based upon the foregoing, and upon the affidavits and evidence submitted to the Court, the settlement agreement was performed by Sundancer, giving rise to an accord and satisfaction of the claim set forth as Count II of the Amended Complaint.

The district court entered partial summary judgment dismissing Plaintiff's claim for wrongful discharge. Plaintiff then voluntarily dismissed Count I of his complaint (fraud) and brought this appeal.

## II. THE RECORD RAISES QUESTIONS OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON THE ACCORD AND SATISFACTION THEORY

■ Defendant initially argues that since the district court did not find the terms of the settlement agreement ambiguous, reference to parol evidence of the parties' intent is inappropriate. Defendant relies upon cases from Mississippi and Maine to support its contention that "[t]he making of a settlement without express reservation of rights constitutes complete accord and satisfaction of all claims of the immediate parties to a settlement arising out of the same transaction or occurrence." We do not believe the rule adopted in Mississippi and Maine applies in New Mexico.

■ Our courts have been willing to go outside the simple terms of a settlement agreement to determine the nature of the transaction and scope of the intent of the parties regarding whether such agreement was intended to be an accord and satisfaction. See, e.g., Mark V, Inc. v. Mellekas, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) (in interpreting the intent of parties to a con-

tract a court is not restricted to the bare words of the agreement and may consider context in which the agreement was made to determine whether the parties' words are ambiguous). An accord and satisfaction must be accompanied by such acts or declarations as amount to a condition that if money is accepted, it is to be in full satisfaction; and the acts or declarations must be of such character that the party to whom the money is offered is bound to understand that, if he accepts the money, he accepts it subject to such conditions. Los Atrevidos v. Preferred Risk Life Ins. Co., 107 N.M. 217, 218, 755 P.2d 61, 62 (1988). While such a showing could possibly be made from the settlement document itself, application of these principles more characteristically requires an investigation into the surrounding circumstances. See, e.g., Smith Constr. Co. v. Knights of Columbus, Council # 1226, 86 N.M. 50, 519 P.2d 286 (1974) (reversing summary judgment and holding that correspondence surrounding the execution of the agreement created doubt as to whether it was intended to operate as an accord and satisfaction).

■ The district court's determination that the agreement in the present case was unambiguous is reviewed as a matter of law. Levenson v. Mobley, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987). An agreement is unambiguous when its language permits only one reasonable interpretation. See id. We do not agree with the district court that the settlement agreement is unambiguous.

The agreement is unclear concerning the extent or scope of the settlement. Paragraph One of the agreement refers to a separate settlement of Plaintiff's workers' compensation claim, thus raising an inference that the present agreement was intended to apply only to the matters specifically referred to therein. Other than the requirement that Defendant remove all negative information regarding Plaintiff's termination from Defendant's files and provide "neutral or better" references regarding Plaintiff's employment, the remainder of the settlement

agreement appears to be directed at Defendant's compliance with obligations imposed by the Bureau to prevent discrimination against other potential whistleblowers. The agreement concludes: "[N]or shall this Settlement Agreement be used by Gutierrez or the Environmental Improvement Division against Sundancer, in any way, except for enforcement of the terms and conditions hereof." It could be inferred that Defendant anticipated further action by either the Bureau or Plaintiff and sought to prevent the settlement agreement from being used as any evidence of wrongdoing. If further action was anticipated, then it is unlikely that the parties intended the settlement agreement to be an accord and satisfaction.

Other documents introduced in the present case appear analogous to those found insufficient to sustain a summary judgment in *Smith Construction*. In support of its motion for partial summary judgment, Defendant filed Plaintiff's entire personnel file as well as the complete Bureau file. The Bureau's file consists of 130 pages of correspondence, memoranda, diagrams, and notices. A review of such documents could lead to the conclusion that the administrative proceeding was not viewed by the participants as a procedure to remedy any and all damage suffered by Plaintiff.

In response to Defendant's motion for partial summary judgment, Plaintiff filed his own affidavit stating that, "[t]he January 11, 1990, Settlement Agreement did not settle my dispute with Sundancer Jewelry for wrongful discharge or fraud." Plaintiff also filed an affidavit from the Bureau Chief. The affidavit indicated that, although the Bureau Chief approved the settlement agreement between Plaintiff and Defendant, the settlement agreement "did not address or adjudicate any claims of wrongful discharge, nor was it intended to prevent future litigation concerning wrongful discharge claims or any related claims thereto which are not included within the scope of § 50–9–25 NMSA 1978." Defendant challenges the statements in the affidavits of Plaintiff and the Bureau Chief on the ground that they are conclusory and therefore insufficient to establish material issues of fact significant enough to defeat Defendant's motion for partial summary judgment. Based on the documents and affidavits submitted, we disagree.

Our Supreme Court faced an analogous situation in *Western Bank v. Biava*, 109 N.M. 550, 787 P.2d 830 (1990). In that case, the plaintiff bank sued on a promissory note. However, the defendant alleged that the plaintiff had agreed to accept a transfer of partnership interest in exchange for a complete release on the promissory note. The defendant, in resisting a motion for summary judgment, filed his own affidavit and submitted his own testimony on deposition in support of his contention of accord and satisfaction. *Id.* at 552, 787 P.2d at 832. As in the present case, the party seeking summary judgment alleged that such statements were merely conclusory and insufficient to defeat summary judgment. *Id.* at 552–53, 787 P.2d at 832–33. The Supreme Court found that the testimony of the party resisting summary judgment regarding his understanding of the nature and scope of an agreement was sufficient to meet his burden to "come forward with evidentiary facts sufficient to defeat the motion for summary judgment on the accord-and-satisfaction defense." *Id.* at 553, 787 P.2d at 833.

The Supreme Court again reversed a grant of summary judgment based on an accord and satisfaction argument in *Bennett v. Kisluk*, 112 N.M. 221, 814 P.2d 89 (1991). In that case, the plaintiff had hired the defendant attorney to prosecute her claims arising from a slip and fall accident. During the tort proceedings the plaintiff dismissed the defendant and retained new counsel to pursue her claims. The defendant filed a motion seeking a forty-percent share of any tort recovery as his fee. *Id.* at 222, 814 P.2d at 90. When the plaintiff reached an agreement on the personal injury claim, she was required to settle the defendant's claim for attorneys' fees. Pursuant to the fee settlement, both the plaintiff and the defendant executed a stipulation for settlement and release of all claims. *Id.* Five months after the execution

of that release, the plaintiff sued the defendant alleging malpractice, intentional infliction of emotional suffering, and seeking treble damages under NMSA 1978, Section 36–2–17 (Repl.Pamp.1984). The defendant moved for summary judgment on the ground that the prior release constituted an accord and satisfaction. The plaintiff argued that, at all times, she had intended to pursue her claims against the defendant, and in the initial fee settlement agreement she was concerned only with resolution of the attorneys' fees claim which had prevented her consummation of the personal injury settlement. 112 N.M. at 224, 814 P.2d at 92. The defendant, like Defendant in the case at bar, argued that the plaintiff was attempting to "sandbag" him; the defendant contended that the possibility of the potential claims for malpractice, intentional infliction of emotional suffering, or misrepresentation never entered his mind when he executed the release in the attorneys' fee dispute. *Id.* The district court granted summary judgment, and the Court of Appeals affirmed. In reversing, the Supreme Court said:

> Under these circumstances, the language of the release cannot be said, upon a motion for summary judgment, to be a universal accord and satisfaction. From both the overt manifestations of agreement and the states of mind of the parties it can be inferred that the parties did not intend a universal accord and satisfaction. Under SCRA 1986, 11–301 (rule of evidence regarding presumptions in general in civil actions), these inferences are to be weighed by the trier of fact against the presumption [that the parties intended a complete settlement of their respective claims]....
>
> ....

Accordingly, we reverse and remand for trial, including the factual issue whether the parties intended a universal accord and satisfaction.

*Id.*

■ Applying the dictates of *Bennett*, we must reverse and remand for trial, including the factual issue of whether the parties intended a universal accord and satisfaction.[1]

### III. *NMOHSA DOES NOT PROVIDE THE EXCLUSIVE REMEDY FOR WRONGFUL DISCHARGE*

The district court found that the settlement approved by the Bureau resolved all claims between Plaintiff and Defendant. Therefore the district court was not required to confront the issue of whether NMOHSA precludes employees in such situations from pursuing common-law legal remedies. Since we have found that there is a question of material fact as to the parties' intent regarding the scope of the settlement agreement, we must now confront Defendant's alternative argument, "that Plaintiff did not have any remedies available to him for retaliatory discharge other than those provided by Section 50–9–25[.]"

■ When a statute creates a new right or imposes a new duty, having no counterpart in common law, the remedies provided in the statute are generally deemed to be exclusive and not cumulative. *Munro v. City of Albuquerque*, 48 N.M. 306, 321–322, 150 P.2d 733, 742 (1943); *Patterson v. Globe Am. Casualty Co.*, 101 N.M. 541, 544, 685 P.2d 396, 399 (Ct.App.1984); *First · Nat'l Bank v. Southwest Yacht & Marine Supply Corp.*, 101 N.M. 431, 437, 684 P.2d 517, 523 (1984) (Stowers, J., dissenting). In order to determine whether NMOHSA creates new rights and duties, and thus provides exclusive reme-

---

1. The dissent herein challenges the holding in *Bennett* as an aberration in the development of general contract law. As we have noted, New Mexico has long recognized that a party receiving payment must understand such payment to be in full settlement of all claims before the bar of accord and satisfaction precludes the payee from bringing further litigation. *Los Atrevidos,* 107 N.M. at 218, 755 P.2d at 62; *Miller v. Prince*

*St. Elevator Co.,* 41 N.M. 330, 337, 68 P.2d 663, 667 (1937). *Bennett* is but an application of this well established principle. In any event, we do not understand the present dissent to say anything different than the original dissent in *Bennett.* Whatever the merit of this interpretation, we are obligated to apply the law as interpreted by the *Bennett* majority. *Alexander v. Delgado,* 84 N.M. 717, 718, 507 P.2d 778, 779 (1973).

dies, or merely codifies preexisting common-law rights and duties, we must answer three questions: (1) whether New Mexico has recognized a common-law duty of an employer to provide employees with a safe workplace; (2) if so, whether retaliatory discharge for reporting violations of that common-law duty contravenes public policy thus giving rise to a common-law remedy; and, (3) if so, whether there is any indication in the NMOHSA that the legislature intended its remedies to be exclusive and thus preempt the common-law remedy.

A. *Employers in New Mexico Have a Duty to Provide Employees with a Safe Workplace*

■ New Mexico has recognized that, at common law, an employer must exercise reasonable care to provide an employee with a safe workplace. *Koenig v. Perez*, 104 N.M. 664, 667, 726 P.2d 341, 344 (1986); *Arvas v. Feather's Jewelers*, 92 N.M. 89, 91 582 P.2d 1302, 1304 (Ct.App.1978).

B. *Allowing an Employer to Retaliate Against an Employee for Reporting Unsafe Working Conditions to Appropriate Public Officials is Contrary to Public Policy in New Mexico*

■ New Mexico has recognized a public-policy exception to the common-law employment-at-will doctrine. *Vigil v. Arzola*, 102 N.M. 682, 688, 699 P.2d 613, 619 (Ct.App. 1983), *rev'd in part on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984), *modified by Boudar v. E.G. & G., Inc.*, 106 N.M. 279, 280–81, 742 P.2d 491, 492–93 (1987) (allowing retroactive application), *and modified by Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 649–50, 777 P.2d 371, 377–78 (1989) (lowering plaintiff's burden of proof and allowing recovery for emotional distress). Consequently, an at-will employee may recover in tort when his discharge contravenes a clear mandate of public policy. *Chavez*, 108 N.M. at 647, 777 P.2d at 375. Whether an employee has stated a sufficient policy to recover for the tort of wrongful discharge is determined on a case-by-case basis. *Sanchez v. The New*

*Mexican*, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987); *Shovelin v. Central N.M. Elec. Coop.*, 115 N.M. 293, 304, 850 P.2d 996, 1007 (1993). In the case at bar, defendant concedes that Section 50–9–25, which itself is a codification of an existing common-law duty, clearly enunciates a public policy in favor of reporting safety violations. *See Vigil*, 102 N.M. at 688–89, 699 P.2d at 619–20. Thus, we find that allowing an employer to retaliate against an employee for reporting unsafe working conditions to appropriate public officials is contrary to public policy in New Mexico and gives rise to a common-law remedy.

The dissent argues that, except for NMOHSA, there is no public policy sufficient to prohibit retaliatory discharge under the complaint in this case. *But cf.* NMSA 1978, § 52–1–28.2 (Repl.Pamp.1991) (establishing a cause of action against an employer who discharges, threatens to discharge, or otherwise retaliates against an employee for seeking workers' compensation benefits). Since NMOHSA, by its own terms, cannot itself give rise to a common-law action, the dissent concludes no common-law action for wrongful discharge exists in the case at bar. However, statutes are not the sole source of public policy. Arthur S. Leonard, *A New Common Law of Employment Termination*, 66 N.C.L.Rev. 631, 658–59 (1988). Thus, the inquiry must include the questions of whether there are other sources of public policy that apply in this context, and, if so, whether the scope of such public policy is sufficient, as a matter of common law to prohibit retaliatory discharge of an employee who reports unsafe working conditions.

■ As the dissent notes, some courts have held the only permissible source of public policy is a statute or constitution. *E.g., Gantt v. Sentry Ins.*, Cal. 4th 1083, 4 Cal. Rptr.2d 874, 881, 824 P.2d 680, 687 (1992) (en banc). This position, however, is contrary to long established precedent in New Mexico which recognizes that the judiciary as well as the legislature is an appropriate source of public policy. *In re Santillanes*, 47 N.M.

140, 150, 138 P.2d 503, 509 (1943); *Barwin v. Reidy,* 62 N.M. 183, 192, 307 P.2d 175, 181 (1957); *Southwest Community Health Servs. v. Smith,* 107 N.M. 196, 201, 755 P.2d 40, 45 (1988). This position is especially apropos when the public policy relates to a rule of common law. *See Hicks v. State,* 88 N.M. 588, 589–92, 544 P.2d 1153, 1154–57 (1975).

■ Since the New Mexico courts previously recognized an employer's duty to provide a safe workplace, NMOHSA merely codified and detailed the scope of that duty. The fact that the legislature acts to codify the public policy which underlies a common-law action does not, absent some evidence of an intent to the contrary, abolish the common-law action. *Valdez v. State,* 83 N.M. 720, 722, 497 P.2d 231, 233, *cert. denied,* 409 U.S. 1077, 93 S.Ct. 694, 34 L.Ed.2d 666 (1972); *Gonzalez v. Whitaker,* 97 N.M. 710, 714, 643 P.2d 274, 278 (Ct.App.1982). Many courts, in fact, have held that recognition of a common-law remedy for wrongful discharge supports, and is often necessary to reinforce, statutes designed to promote safety in the workplace. *Paige v. Henry J. Kaiser Co.,* 826 F.2d 857, 863 (9th Cir.1987), *cert. denied,* 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988); *Cloutier v. Great Atl. & Pac. Tea Co.,* 121 N.H. 915, 436 A.2d 1140, 1144 (1981); *cf. Tyrna v. Adamo, Inc.,* 159 Mich.App. 592, 407 N.W.2d 47, 50 (1987) (remedies under Whistleblower Protection Act overlap Michigan OSHA remedies when employee is discharged in retaliation for reporting safety violations). The Supreme Court of Arizona explained its basis for protecting whistleblowers who expose workplace conditions which violate public policy, regardless of the source of such policy, in the following terms:

We believe that whistleblowing activity which serves a public purpose should be protected. So long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged. We recognize that there is a tension between the obvious societal benefits in having employees with access to information expose activities which may be illegal or which may jeopardize health and safety, and accepted concepts of employee loyalty; nevertheless we conclude that on balance actions which enhance the enforcement of our laws or expose unsafe conditions, or otherwise serve some singularly public purpose, will inure to the benefit of the public. . . .

The relevant inquiry is not limited to whether any particular law or regulation has been violated, although that may be important, but instead emphasizes whether some "important public policy interest embodied in the law" has been furthered by the whistleblowing activity.

*Wagner v. City of Globe,* 150 Ariz. 82, 722 P.2d 250, 257 (1986) (en banc) (citations omitted).

Legal scholars have also recognized that protecting only those whistleblowers whose actions derive from a specific statutory duty is inconsistent with the origin of the tort of wrongful discharge and results in broad societal harm. Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 5.19A (2d ed. Cum.Supp.1989); Martin H. Malin, *Protecting the Whistleblower From Retaliatory Discharge,* 16 U.Mich.J.L.Ref. 277, 285 (1983).

Based on such considerations, numerous courts in recent years have recognized a common-law cause of action based on allegations of wrongful discharge by employees who attempted to require management to remedy unsafe working conditions or who filed a claim based on such conditions. *E.g., D'Angelo v. Gardner,* 107 Nev. 704, 819 P.2d 206, 218 (1991); *Smith v. Atlas Off–Shore Boat Serv., Inc.,* 653 F.2d 1057, 1062 (5th Cir.1981); *Sorge v. Wright's Knitwear Corp.,* 832 F.Supp. 118, 120–21 (E.D.Pa.1993).

C. *Nothing in NMOHSA Indicates the Legislature Intended to Preempt Common–Law Remedies*

1. *Defendant's Argument*

■ Defendant argues that Section 50–9–25 is proof of a legislative intent to make the

remedies under NMOHSA exclusive. Defendant's argument relies on the law of implied remedies and cites *Vigil* for the proposition that when a statute defines public policy and provides a remedy for violations of that policy, courts will not imply an additional remedy. In the case at bar, however, Plaintiff has a preexisting common-law action, not a remedy implied from NMOHSA.

We find nothing in the language of NMOHSA which indicates the legislature intended that its remedies be exclusive. Further, a review of cases from other jurisdictions which interpret occupational safety and health acts supports our view that our own Occupational Health and Safety Act does not preempt existing common-law remedies.

### 2. *Federal Precedent*

Section 50–9–25(B) is virtually identical to the provision of the federal Occupational Safety and Health Act upon which it was patterned, 29 U.S.C. § 660(c) (1985). Several federal courts have recognized that the language of 29 U.S.C. § 660(c) was not designed to preempt any common-law remedies that an employee may have under state law. *Sorge*, 832 F.Supp. at 121; *Kilpatrick v. Delaware County S.P.C.A.*, 632 F.Supp. 542, 548 (E.D.Pa.1986); *McElroy v. SOS Int'l, Inc.*, 730 F.Supp. 803, 807–08 (N.D.Ill.1989). This conclusion is also supported by the legislative history which indicates that Congress only intended to provide a parallel remedy for breach of the common-law duty to provide employees a safe workplace. Senate Committee on Labor and Public Health, Occupational Safety and Health Act of 1970, S.Rep. No. 91–1282 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5177, 5186.

### 3. *State Precedent*

Courts which have considered language from the federal OSHA, which state codes are patterned after, have also concluded that the language contained in the acts indicates a legislative intent to provide a parallel rather than an exclusive remedy. *Lepore v. National Tool & Mfg. Co.*, 224 N.J.Super. 463, 540 A.2d 1296, 1298–99 (1988) *aff'd per curiam*, 115 N.J. 226, 557 A.2d 1371, *and cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989); *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1093–94 (9th Cir.1990). In *Reed v. Municipality of Anchorage*, 782 P.2d 1155 (Alaska 1989), the Alaska Supreme Court confronted the issue of whether the state OSHA (which contains language functionally equivalent to that in NMOHSA), by providing an administrative remedy, was intended to be exclusive:

> On its face, [Alaska Statute] 18.60.089 contains no such prohibition. Indeed, it seems to us that the statute does not preclude an employee from instituting an action in Alaska under a recognized tort or contract theory. Alaska Statute 18.60.-089(b) states that an employee *may* file a complaint with the commissioner. Such action is permissive and is required to initiate the remedial process specifically contained in the statute. This process consists of the commissioner's investigation of the employee's complaint. However, [Alaska Statute] 18.60.089 does not show an intent on the part of the legislature to preclude an employee from suing on his own behalf. If the legislature had wanted to foreclose a private common law cause of action, it could have done so expressly.

*Reed*, 782 P.2d at 1158–59 (footnote omitted, emphasis in original).

### 4. *Purpose of NMOHSA*

Defendant's interpretation of NMOHSA as preemptive of common-law remedies is also inconsistent with the stated purposes of the Act. Initially we note that Section 50–9–21(A) states:

> Nothing in [NMOHSA] shall be construed or held ... to enlarge or diminish or affect in any other manner the common law or statutory rights, duties or liabilities of employers and employees under the laws of this state with respect to injuries, occupational or other diseases, or death of employees arising out of or in the course of employment.

While this passage does not directly apply to wrongful discharge, the broad language of the provision demonstrates the tenor of the statute as not intending to affect the common-law rights that relate to the health and safety of employees. In addition, Section 50–9–2.1(B) provides that "it is in the public interest to establish a comprehensive program for the disclosure of information about hazardous substances in places of employment and to provide a procedure whereby employees may gain access to this information." The primary purpose of NMOHSA, then, is to ensure reporting of safety violations to the Bureau, not to compensate employees for wrongful discharge resulting from the reporting of such violations. *Cf. Wiggins v. Eastern Associated Coal Corp.*, 178 W.Va. 63, 357 S.E.2d 745, 748 (1987) (primary purpose of the penalties imposed under antidiscrimination provisions of the mine safety acts is to ensure reporting of safety violations rather than vindication of employees' rights; no preemption); *Carsner v. Freightliner Corp.*, 69 Or.App. 666, 688 P.2d 398, 403 (antidiscrimination section of labor code designed to prevent a different evil than common-law claim for emotional distress when employee is allegedly fired for complaining about job safety practices), *review denied*, 298 Or. 334, 691 P.2d 483 (1984).

If NMOHSA is interpreted to provide the exclusive remedy, it may in fact discourage employees from disclosing information about hazardous substances in places of employment. This conclusion follows from the fact that the only remedy available under NMOHSA for workers who are discharged for disclosing such information is an action brought at the discretion of the Director of the Environmental Improvement Division seeking to restrain violations of NMOHSA and "for other appropriate relief including rehiring or reinstatement of the employee to his former position with back pay." Section 50–9–25(B). Many employees would not wish to rely upon the Director finding sufficient cause after an investigation and then bringing a discretionary action or upon the relief such action could provide. It can also be fairly assumed that many employees who are discharged for reporting unsafe working conditions would have no interest in being rehired to work in such conditions, with or without back pay.

If the purpose of NMOHSA is to encourage the reporting of safety violations, and without doubt such is the case, then we find it highly unlikely that NMOHSA would also have had the intent of preempting common-law actions that further such purpose. Defendant's interpretation would use the limited remedies available under NMOHSA to defeat the very goal set forth by the legislature.

## IV. CONCLUSION

We hold that the district court erred in granting summary judgment on Defendant's accord and satisfaction theory. Under New Mexico Supreme Court precedent the affidavits filed by Plaintiff in opposition to the motion for summary judgment raised sufficient questions with regard to the scope of the settlement agreement and the intent of the parties to defeat the motion.

We also reject Defendant's argument that NMOHSA provides Plaintiff his exclusive remedy for wrongful discharge. The common law requires that employers provide employees with a reasonably safe workplace. Public policy in New Mexico prohibits discharging an employee for reporting unsafe working conditions to the Bureau. Finally, we find that the legislature did not intend NMOHSA to provide the exclusive remedy for an employee alleging wrongful discharge in retaliation for reporting safety violations.

Therefore the summary judgment of the district court is reversed; each side shall bear its own costs on appeal.

**IT IS SO ORDERED.**

DONNELLY, J., concurs.

HARTZ, J., dissents.

HARTZ, Judge (dissenting).

The result reached by the majority opinion does not concern me as much as the way it

gets there. The majority's discussion of both defenses raised by Defendant—(1) accord and satisfaction and (2) absence of a common-law cause of action—glosses over or ignores doctrines that have commanded the respect of the great weight of authority. I fear that the majority's freewheeling opinion will generate a great deal of confusion for practitioners and the courts.

## I. ACCORD AND SATISFACTION

As stated in the second sentence of the majority opinion, "[t]he parties entered into a settlement agreement." The question before us is what are the terms, express and implied, of the settlement agreement. Our task is not to determine whether there was ever a contract between the parties, which distinguishes this case from several of the cases relied upon by the majority: *Los Atrevidos v. Preferred Risk Life Ins. Co.*, 107 N.M. 217, 755 P.2d 61 (1988); *Smith Constr. Co. v. Knights of Columbus*, 86 N.M. 50, 519 P.2d 286 (1974); *Western Bank v. Biava*, 109 N.M. 550, 787 P.2d 830 (1990).

The settlement agreement undoubtedly resolved the discrimination complaint filed against Defendant by Plaintiff with the New Mexico Health and Environment Department, Occupational Health and Safety Bureau (the Bureau). The agreement does not specifically address the question of other claims Plaintiff may have had against Defendant. As a matter of ordinary contract law, one could properly describe the settlement agreement as ambiguous on that score. As a matter of public policy, however, courts presume that when parties have settled a dispute they "intended a complete accord and satisfaction of their respective claims against each other arising out of [the facts underlying the explicitly settled dispute]." *Bennett v. Kisluk*, 112 N.M. 221, 223, 814 P.2d 89, 91 (1991). "The presumption advances public policy interests in avoiding needless litigation and places on the releasee a burden to prove the contracting parties did not, by the release and settlement, intend an accord and satisfaction." *Id.* Here, there is no question that the present claim arises out of the same underlying facts as the claim that was explicitly settled. Therefore, Defendant must prevail on its defense of accord and satisfaction unless the presumption of a complete accord and satisfaction is rebutted.

The majority opinion ignores the New Mexico precedent establishing the presumption of a complete accord and satisfaction. Consequently, it does not address Plaintiff's evidence and arguments in terms of whether they rebut the presumption. The opinion speaks only in terms of whether the evidence below and the terms of the settlement agreement establish an ambiguity regarding the existence of an accord and satisfaction covering the present claim. Nevertheless, the matters relied upon by the majority to support a contention that the settlement agreement is ambiguous are also proper subjects of consideration in determining whether the presumption of a complete accord and satisfaction has been rebutted. I shall therefore address the evidence and arguments raised by the majority opinion. The majority opinion rests its determination of ambiguity on affidavits by Plaintiff and the Bureau chief and on statements in the settlement agreement itself.

### A. The Affidavits.

My greatest concern is with the majority's reliance on the two affidavits. Plaintiff's affidavit states: "The January 11, 1990, Settlement Agreement did not settle my dispute with Sundancer Jewelry for wrongful discharge or fraud." The Bureau chief's affidavit states: "[The] Settlement Agreement ... did not address or adjudicate any claims of wrongful discharge, nor was it intended to prevent future litigation concerning wrongful discharge claims or any related claims thereto which are not included within the scope of § 50-9-25 NMSA 1978."

The affidavits do not rebut the presumption of a complete accord and satisfaction. They do not allege the existence of any written or oral side agreements, nor do they discuss any circumstances surrounding the settlement agreement that would assist in

interpreting the terms of the agreement. Rather, they merely state how the affiants would interpret the agreement, asserting that the agreement did not foreclose Plaintiff from any further litigation regarding his discharge by Defendant. These allegations have no legal significance. The private thoughts of a party to a contract are of no consequence in interpreting the terms of a contract. The test of what a contract means is an objective one, based on what the parties said and did and the surrounding circumstances.

The source of the majority's error can probably be traced to the use of the phrase "meeting of the minds" in contract law. Often it is written that a contract requires a "meeting of the minds" of the parties. The phase creates problems because it can readily be interpreted to refer to the unconveyed thoughts of the parties. As thus interpreted, the phrase leads to error in the application of contract law. *See* E. Allan Farnsworth, *Contracts* § 3.6, at 113 n. 2 (1982) [hereinafter Farnsworth] (recommending abandonment of the "much abused metaphor" of "meeting of the minds"). For that reason, Restatement (Second) of Contracts (1979) avoids use of "meeting of the minds" in the black letter propositions. Section 17, for example, states the general rule that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Explaining the decision not to use the phrase "meeting of the minds," Comment c to the section states:

> "*Meeting of the minds.*" The element of agreement is sometimes referred to as a "meeting of the minds." The parties to most contracts give actual as well as apparent assent, but it is clear that a mental reservation of a party to a bargain does not impair the obligation he purports to undertake. The phrase used here, therefore, is "manifestation of mutual assent," as in the definition of "agreement" in § 3.

*See id.* § 3 ("An agreement is a manifestation of mutual assent on the part of two or more persons."); *id.* § 2(1) ("A promise is a manifestation of intention to act or refrain

from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."); Farnsworth, *supra,* §§ 3.6 to 3.9.

An undisclosed understanding of a contract is also irrelevant to *interpretation* of the contract. As stated in Comment a to Section 212 of the Restatement: "Interpretation of contracts deals with the meaning given to language and other conduct by the parties rather than with meanings established by law. But the relevant intention of a party is that manifested by him rather than any different undisclosed intention." Learned Hand expressed the proposition as follows:

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

*Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911).

I recognize that some New Mexico appellate decisions may contribute to the confusion. For example, in *Garcia v. Middle Rio Grande Conservancy District,* 99 N.M. 802, 807, 664 P.2d 1000, 1005 (Ct.App.), *cert. denied,* 99 N.M. 740, 663 P.2d 1197 (1983), the Court wrote, "In order to establish a binding contractual agreement, plaintiff must prove a meeting of the minds was arrived at between the parties or that a mutual agreement was objectively manifested by each party." To avoid confusion, one should amend the quot-

ed language (as the Supreme Court did recently in an unpublished opinion) by inserting a parenthetical so that the proposition reads, "plaintiff must prove a meeting of the minds was arrived at between the parties or (in other words) that a mutual agreement was objectively manifested by each party." This reading of *Garcia* is consistent with *Trujillo v. Glen Falls Insurance Co.*, 88 N.M. 279, 540 P.2d 209 (1975), which was cited by *Garcia* as the support for the quoted proposition. *Trujillo*, after quoting a Georgia opinion requiring a meeting of the minds, said, "This mutuality requirement must be found in the objective manifestations of the parties." *Id.* at 281, 540 P.2d at 211. The Court went on to quote an earlier New Mexico opinion that stated, "[T]he controlling intention of the parties is the mutually expressed assent and not the secret intent of a party." *Id.*

The majority opinion's citation to *Miller v. Prince Street Elevator Co.*, 41 N.M. 330, 68 P.2d 663 (1937), and *Los Atrevidos* in its footnote 1 is misleading. These cases do not support the statement that "a party receiving payment must understand such payment to be in full settlement of all claims before the bar of accord and satisfaction precludes the payee from bringing further litigation." Neither decision adopts a subjective test for determining whether there has been an accord and satisfaction. On the contrary, *Los Atrevidos* quotes *Pitts v. National Independent Fisheries Co.*, 71 Colo. 316, 206 P. 571 (1922), for the proposition that:

> In order to constitute an accord and satisfaction, it is necessary that the money should be offered in full satisfaction of the demand, and be accompanied by such acts and declarations as amount to a condition

that the money, if accepted, is accepted in satisfaction; and it must be such that the party to whom it is offered is *bound to understand* therefrom that, if he takes it, he takes it subject to such conditions.

*Los Atrevidos*, 107 N.M. at 218, 755 P.2d at 62 (quoting *Pitts*, 206 P. at 571) (emphasis added). The phrase "bound to understand" clearly implies an objective test—the acts of the offeror must be such that a reasonable offeree in the circumstances would understand that the acceptance is in satisfaction of the claim. *Miller* is virtually identical. It states:

> To constitute an "accord and satisfaction" in law dependent upon an offer of the payment of money, it is necessary that the money be offered in full satisfaction of the demand or claim of the creditor, and be accompanied by such acts or declarations as amount to a condition that if the money be accepted it is to be in full satisfaction and to be of such character that the creditor is *bound so to understand* such offer.

41 N.M. at 337, 68 P.2d at 667 (emphasis added).[1]

To the extent that the majority opinion relies on *Los Atrevidos* and *Miller* as suggesting that there is no accord and satisfaction unless the parties explicitly agree that the settlement governs all possible disputes between the parties, it is mistaken. The issue in each of those cases was whether a payment toward a debt was accepted as full payment or only partial payment. Neither opinion addressed the extent to which a settlement of one claim should be interpreted to include a resolution of other claims arising from the same underlying facts. In particular, neither opinion addressed the presump-

---

1. Also to the same effect is *Smith Construction Co.* The Supreme Court wrote:

> We conclude that it is far from clear that an accord and satisfaction was executed by the conduct of the parties. The language contained in appellee's letter is not such that appellant was *bound to understand* that the letter and check represented an offer to settle their dispute. In fact, appellant's letter says as

much. At the least, there is a reasonable doubt as to whether *the conduct of the parties gave rise to the existence of an accord and satisfaction.* Consequently, this reasonable doubt forecloses the possibility of summary judgment.

*Smith Construction Co.*, 86 N.M. at 52, 519 P.2d at 288 (emphasis added). Obviously, the court was relying on the objective manifestations of the parties.

tion, recently reaffirmed by our Supreme Court in *Bennett*, that a settlement encompasses all related claims.

*Biava*, 109 N.M. at 552–53, 787 P.2d at 832–33, also does not support the majority. It is readily distinguishable from the present case. The issue in *Biava* was whether the defendant could prove the existence of an oral agreement by testimony stating only that the witness had reached an agreement with the opposing party on certain terms. The court in essence held that the witness used acceptable lay shorthand to describe an exchange of promises. Here, both parties admit that a written agreement exists. The sole issue is its meaning. The affidavits in this case state only the affiants' understanding of the language of a document. The question before us is whether testimony that a written agreement had a particular meaning in the witness's mind is relevant to the legal consequences of the agreement. That question was not addressed in *Biava*.

I should also note the statement in *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 782, 845 P.2d 1232, 1236 (1993), that "[i]n order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent. *American Bank of Commerce v. M & G Builders*, 92 N.M. 250, 252, 586 P.2d 1079, 1081 (1978)." The citation to *American Bank of Commerce* is for the proposition that "Where a contract is ambiguous, the intent of the parties is to be ascertained from the language and conduct of the parties and the surrounding circumstances, and oral evidence as to that intent is admissible." 92 N.M. at 252, 586 P.2d at 1081. In other words, acceptable oral evidence of intent is not testimony expressing one's past intent; rather, it is oral testimony regarding the language, conduct, and surrounding circumstances from which one determines the objective manifestation of intent.

There is, however, one New Mexico precedent that is somewhat troubling. Some language in *Bennett* supports the majority's view. *Bennett* said: "From both the overt manifestations of agreement and the states of mind of the parties it can be inferred that the parties did not intend a universal accord and satisfaction." 112 N.M. at 224, 814 P.2d at 92. Yet, I am reluctant to believe that those few words were intended to overturn law long settled throughout the United States, including New Mexico. I am not certain what the words "the states of mind of the parties" were intended to convey, but I believe that *Bennett* can best be understood as simply limiting the usual presumption of a general accord and satisfaction when one party to the agreement is an attorney who has represented the other party.

B.  Terms of the Settlement Agreement.

The majority opinion also relies on two provisions in the settlement agreement as indicating ambiguity regarding whether a complete accord and satisfaction was intended. One provision is the reference in the settlement agreement to a settlement of Plaintiff's workers' compensation claim. In the majority's view this reference indicates "that the present agreement was intended to apply only to the matters specifically referred to therein." I fail to see why one should draw that inference. Perhaps some language in the workers' compensation claim settlement agreement would suggest the scope of the settlement here. But on the present record there is not even evidence that the workers' compensation settlement arose out of the same facts as the claim for wrongful discharge in this case. The reference in the present agreement to other unrelated litigation does not in any way counter the presumption of the settlement of all claims arising out of the facts surrounding Plaintiff's discharge. The presumption of a general accord and satisfaction is not a presumption that every claim between the parties is settled. It is only a presumption that there is a complete accord and satisfaction of the claims arising out of the facts underlying the clearly settled claim. *See generally Bennett*, 112 N.M. at 222–24, 814 P.2d at 90–92.

The other provision upon which the majority opinion relies is the statement in the settlement agreement that the agreement cannot be used against Defendant in any way except for enforcement of the terms and conditions of the agreement itself. The majority opinion asserts: "It could be inferred that Defendant anticipated further action by either the Bureau or Plaintiff and sought to prevent the settlement agreement from being used as any evidence of wrongdoing. If further action was anticipated, then it is unlikely that the parties intended the settlement agreement to be an accord and satisfaction." Again, this argument fails to distinguish between claims arising from the same underlying facts—which claims are presumed to be settled—and other claims. The provision in question simply protects Defendant against the use of the settlement agreement as an admission by it in possible future claims (even if not presently contemplated) such as a retaliatory-discharge claim by another employee or even a retaliatory-discharge claim by Plaintiff if he were to be discharged in the future. The provision is certainly no indication that the parties foresaw further litigation regarding the particular discharge at issue here.[2]

Finally, the majority opinion fails to take into consideration a provision in the settlement agreement which argues strongly in support of the presumption that all claims arising from Plaintiff's discharge were resolved by the agreement. Paragraph 2 of the settlement agreement states: "[Defendant] agrees to remove all information from its records concerning [Plaintiff's] termination of May 4, 1989." This provision is highly significant because it strains credulity to think that Defendant would agree to give up control of all records relating to Plaintiff's discharge if there were any possibility of further litigation regarding the discharge. A reasonable person construing the settlement agreement as a whole would have to conclude that the parties did not contemplate such further litigation.

To sum up: The parties undoubtedly entered into a settlement agreement. Under established New Mexico law the agreement is presumed to settle all disputes between the parties arising out of the facts underlying the settled claim. That presumption was not rebutted by the affidavits of Plaintiff and the Bureau chief because those affidavits stated no more than the affiants' previously uncommunicated subjective understanding of the settlement agreement, which is of no legal consequence. The references in the settlement agreement to Plaintiff's workers' compensation claim and to no future use against Defendant of the settlement agreement do not rebut the presumption because the references are fully consistent with a complete settlement of the claims arising out of Plaintiff's discharge by Defendant. On this basis alone Defendant was entitled to its summary judgment on the defense of accord and satisfaction. In addition, as frosting on the cake, the defense of accord and satisfaction is strongly buttressed by the provision in the settlement agreement requiring Defendant to rid itself of all records relating to Plaintiff's discharge.

## II. CAUSE OF ACTION FOR RETALIATORY DISCHARGE

Even if Defendant were not entitled to summary judgment on the defense of accord and satisfaction, the complaint should have been dismissed for failure to state a cause of action for retaliatory discharge. Disregarding state and federal occupational safety statutes, there is no sufficiently clear public policy that always forbids discharging an employee for reporting an alleged safety hazard. If, however, the complaint were not otherwise barred by accord and satisfaction, I would remand to provide Plaintiff with an opportunity to amend the complaint.

Perhaps the most jarring portion of the above summary of my views is the failure to consider occupational safety statutes in determining public policy. Therefore, I will

---

**2.** The majority opinion also suggests that Plaintiff's personnel file indicates that the settlement was not intended as a complete accord and satisfaction. I disagree but cannot respond with specifics because the majority opinion does not explain the basis of its inference.

address that point before discussing the appropriate analysis of a retaliatory-discharge claim.

The reason I would disregard the New Mexico Occupational Health and Safety Act (NMOHSA) in determining whether to recognize a common-law claim for retaliatory discharge is that NMOHSA itself requires me to. NMSA 1978, Section 50–9–21(A) (Repl.Pamp.1993) states:

> Nothing in the Occupational Health and Safety Act shall be construed or held to supersede or in any manner affect the Workers' Compensation Act or the New Mexico Occupational Disease Disablement Law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties or liabilities of employers and employees under the laws of this state with respect to injuries, occupational or other diseases or death of employees arising out of or in the course of employment. .

I agree with the majority opinion that "the broad language of the provision demonstrates the tenor of the statute as not intending to affect the common-law rights that relate to the health and safety of employees." In my view, a common-law right to sue for retaliatory discharge because of an allegation of a safety hazard comes within the statutory language of "common law ... rights ... of ... employees ... with respect to injuries, occupational or other disease or death of employees arising out of or in the course of employment." The majority opinion offers its observation in support of the view, which I share, that NMOHSA does not preempt a common-law claim for retaliatory discharge. Yet, just as Section 50–9–21(A) states that NMOHSA shall not "diminish" common-law rights, it also states that NMOHSA shall not "enlarge" them. I infer that a common-law claim of retaliatory discharge is independent of NMOHSA, and NMOHSA should not be used to enlarge or diminish it. Because 29 U.S.C. § 653(b)(4) (1988) of the federal occupational safety and health act (OSHA) has the same import as Section 50–9–21(A), I believe that OSHA also does not affect the common-law cause of action for retaliatory discharge.

I am not certain whether the majority opinion relies on NMOHSA or OSHA to find the public policy supporting its determination that Plaintiff stated a cause of action. To the extent that the majority opinion so relies, I believe it is mistaken. To the extent that it finds sufficient public policy in other sources, I believe that it ignores important policy considerations and the great weight of authority.

Ever since courts and commentators began to recognize a tort cause of action for retaliatory discharge, they have struggled with the difficulty of setting limits to the tort. Without limits on what sources of public policy can justify the cause of action, the tort could logically expand to require just cause for any dismissal of an employee, contrary to the common-law doctrine of employment at will.

The recent New Mexico Supreme Court decision in *Shovelin v. Central New Mexico Electric Cooperative,* 115 N.M. 293, 850 P.2d 996 (1993), reflects this concern. *Shovelin* stated, "The linchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy.' " *Id.* at 303, 850 P.2d at 1006. Such a clear mandate "may be gleaned from the enactments of the legislature and the decisions of the courts." *Id.* The question that remains is the meaning of "clear mandate."

The holding in *Shovelin* itself provides guidance on that point. Although most citizens would agree that the right of citizens to run for and hold public office is an important feature of our free society, *Shovelin* refused to recognize a cause of action by an employee who claimed that he was fired for running and being elected mayor of his community. The court found no constitutional provision or statute that was a "specific enough expressio[n] of public policy to state a claim for relief under the facts of this case." *Id.* at 306, 850 P.2d at 1009.

Supporting our Supreme Court's cautious approach are the decisions in other jurisdic-

tions. Some jurisdictions have simply refused altogether to recognize a common-law cause of action for retaliatory discharge, leaving the matter to the legislature. *See Scott v. Otis Elevator Co.*, 572 So.2d 902, 903 (Fla.1990); *Pavolini v. Bard Air Corp.*, 88 A.D.2d 714, 451 N.Y.S.2d 288 (1982). Some recognize the tort only when an employee is fired for refusing to perform an illegal act. *See Adams v. George W. Cochran & Co.*, 597 A.2d 28 (D.C.1991); *Peterson v. Glory House*, 443 N.W.2d 653, 655 (S.D.1989); *Hancock v. Express One Int'l*, 800 S.W.2d 634, 636 (Tex.Ct.App.1990). Others recognize the tort only when the discharge violates a public policy expressed by constitution, statute, or a regulation based on statute. *See Sterling Drug v. Oxford*, 294 Ark. 239, 743 S.W.2d 380, 385 (1988); *Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 878, 824 P.2d 680, 684 (1992) (en banc); *Romack v. Public Serv. Co.*, 499 N.E.2d 768, 773 (Ind.Ct.App.1986) (statutory right only); *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661 (Mo.1988) (en banc); *Peterson v. Browning*, 832 P.2d 1280, 1282 (Utah 1992) (public policy will support cause of action for retaliatory discharge "when the statutory language expressing the public conscience is clear and when the affected interests of society are substantial"). Although a fair number of other jurisdictions, including New Mexico, *see Shovelin*, 115 N.M. at 303, 850 P.2d at 1006, state that public policy underlying this cause of action can be derived from judicial decisions, it turns out to be rare for courts to recognize a cause of action for retaliatory discharge in the absence of any supporting public policy expressed in a constitution, statute, or regulation. As the California Supreme Court recently stated, "[N]otwithstanding the lively theoretical debate over the sources of public policy which may support a wrongful discharge claim, with few exceptions courts have, in practice, relied to some extent on statutory or consti-

tutional expressions of public policy as a basis of the employee's claim." *Gantt*, 4 Cal.Rptr.2d at 881, 824 P.2d at 687.[3]

Of particular interest is the cause of action for retaliatory discharge for whistleblowing, as alleged in this case. Although public good may derive from encouraging employees to assert employer misconduct to outsiders whenever the employees wish, there are also likely to be negative consequences. An investigation by an outsider will generally be disruptive and expensive to the employer. Substantial damage is likely to result regardless of whether the allegation is true or false. Even if the allegation is true, the disruption and expense may be unjustifiable if the alleged wrong is not a substantial one.

The employee does not have a right to disregard these concerns. Indeed, the common law recognizes that an employee has a duty of "an undivided and unselfish loyalty" to the employer. *Las Luminarias of the N.M. Council of the Blind v. Isengard*, 92 N.M. 297, 302, 587 P.2d 444, 449 (Ct.App. 1978); *see NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953). This duty of loyalty requires an employee not to whistleblow unless reasonably necessary. Thus, the common-law duty of loyalty requires that an employee not whistleblow unless (1) the allegation is of significant wrongdoing by the employer, (2) the allegation is made in good faith, (3) the allegation is objectively reasonable, and (4) the employee blows the whistle only after making reasonable efforts to correct the problem through efforts within the company. *See* Martin H. Malin, *Protecting the Whistleblower From Retaliatory Discharge*, 16 U.Mich.J.L.Ref. 277, 307–14 (1983) [hereinafter Malin]. Public policy does not support recognition of the common-law tort of wrongful discharge for whistleblowing unless the whistleblowing satisfies these conditions. The majority opinion ignores this public policy.

---

**3.** One jurisdiction that has not relied on constitutional or statutory sources of public policy is New Hampshire. In *Cloutier v. Great Atl. & Pac. Tea Co.*, 121 N.H. 915, 436 A.2d 1140 (1981), the court left to the jury the determination of public policy that would support a cause of action for wrongful discharge. More recently, however, the New Hampshire Supreme Court has retreated somewhat from that position. *See Short v. School Admin. Unit No. 16*, 136 N.H. 76, 612 A.2d 364 (1992).

The first task to accomplish in applying this test is setting the standard for determining whether particular employer misconduct constitutes such significant wrongdoing that it justifies whistleblowing. Whatever the standard, the more precise the better. A clear statement of the boundaries of the cause of action will inform the employer of what conduct is forbidden by law. More importantly, if recognition of the tort of retaliatory discharge for whistleblowing is intended to encourage appropriate whistleblowing, a vague standard is unlikely to influence a potential whistleblower who does not wish to risk losing employment as a result of making the allegation. *See* Malin, *supra*, at 286–87. Given the advantages of precision in the definition of the common-law tort of retaliatory discharge for whistleblowing, and the general reliance of the courts on statutes as the source of public policy supporting the common-law tort of retaliatory discharge, one could conclude that *Shovelin*'s requirement of a "clear mandate of public policy" is satisfied in the whistleblowing context only if the allegation concerns a statutory violation—or at least a violation of some enacted law, such as a statute, ordinance, or regulation.

In that regard, I find the provisions of various state whistleblowing statutes to be of interest. I am aware of fourteen state statutes that protect whistleblowing in general. *See* Conn.Gen.Stat. § 31–51m (Supp.1993); Fla.Stat.Ann. ch. 448.102 (Supp.1992); Haw. Rev.Stat.Ann. § 378–62 (1988); Me.Rev.Stat. Ann. tit. 26, § 833(1) (West 1988); Mich. Comp.Laws Ann. § 15.362 (West 1981); Minn.Stat. § 181.932 (1993); Mont.Code Ann. § 39–2–904(1) (1993); N.H.Rev.Stat.Ann. § 275–E:2 (1988); N.J.Stat.Ann. § 34:19–3(a) (West 1988); N.Y.Lab.Law § 740(a) (McKinney 1988); Ohio Rev.Code Ann. § 4113.52(B) (Anderson 1991); Or.Rev.Stat.Ann. § 659.550 (Supp.1992); Pa.Stat.Ann. tit. 43, § 1423(a) (1991); R.I.Gen.Laws § 36–15–3 (1990). Nine of the statutes—Florida, Hawaii, Michigan, Minnesota, New Hampshire, New Jersey, New York, Ohio, and Rhode Island—are limited to reports of violations of statutes, regulations, ordinances, or rules. The Ore-

gon statute is restricted to reporting criminal activity or causing an information or complaint to be filed against someone. Section 659–550. Montana protects against retaliation for reporting a violation of "public policy," but the statute defines "public policy" as a policy established by "constitutional provision, statute, or administrative rule." Section 39–2–903(7). Connecticut extends protection to municipal employees who report "unethical practices, mismanagement or abuse of authority" by the municipal employer. Section 31–51m(b). The Pennsylvania statute protects employees against discharge for reporting "wrongdoing" or "waste"; the statute defines "waste" as "conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources," and defines wrongdoing as a violation of a statute, ordinance, regulation, or code of conduct or ethics "designed to protect the interest of the public or the employer." Section 1422. The Maine statute protects reports regarding "a condition or practice that would put at risk the health or safety" of the employee or another person. Section 833(1)(B). Thus, although there are exceptions, the weight of legislative authority appears to be that if whistleblowing in general is to be protected at all, it should be protected only for reporting violations of statutes, rules, regulations, and the like.

In light of current developments in the common law regarding retaliatory discharge and the legislation reflecting public policy in other states, I find it difficult to say that there is a "clear" policy protecting whistleblowers who allege wrongdoing other than violations of statutes and regulations. I would think that *Shovelin* would extend the common-law cause of action for whistleblowing no further, except perhaps to protect reports of conditions or practices that subject persons to grave danger. *See Francis v. Memorial Gen. Hosp.*, 104 N.M. 698, 701, 726 P.2d 852, 855 (1986) (tort of retaliatory discharge is intended to address "unlawful or serious misconduct"); *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685, 689–90 (1988) (recog-

nizing actionable tort for whistleblowing regarding *serious* infraction of law). Because Section 50–9–21(A) of NMOHSA and the corresponding provision of OSHA prevent Plaintiff from relying on either NMOHSA or OSHA or their accompanying regulations in his common-law claim, Plaintiff could prevail here only if he claimed and proved that his whistleblowing alleged a condition or practice that created a grave danger.

As for the requirements that the whistleblowing be made in good faith, with an objectively reasonable basis, and only after exhaustion of reasonable internal efforts, there appears to be a trend in the more recent statutes to impose such requirements. Good faith is required by the statutes of Maine, New Hampshire, Ohio, Oregon, and Pennsylvania. Reasonable belief or reasonable cause is required by the statutes of Maine, New Hampshire, Ohio, and Rhode Island. (Hawaii requires that the allegation not be knowingly false, and Minnesota requires that it not be knowingly false or reckless.) The statutes of Florida, Maine, New Hampshire, New Jersey, New York, and Ohio require the employee ordinarily to first report the problem to the employer. Courts have also imposed these requirements as a matter of common law. *See Palmer*, 752 P.2d at 690 (whistleblowing must have been in good faith); *Schriner v. Meginnis Ford Co.*, 228 Neb. 85, 421 N.W.2d 755, 759 (1988) (action lies only when employee acts in good faith and upon reasonable cause in reporting employer's suspected criminal violation); *cf. Seery v. Yale–New Haven Hosp.*, 17 Conn. App. 532, 554 A.2d 757 (1989) (plaintiffs fired for refusing to work with impaired physician must provide evidence that physician was actually impaired); *House v. Carter–Wallace, Inc.*, 232 N.J.Super. 42, 556 A.2d 353, 358, *cert. denied*, 117 N.J. 154, 564 A.2d 874 (1989) (employee who claimed retaliatory discharge for his complaint within company regarding contamination of products can recover only if he had reasonable belief that products were contaminated).

To sum up, because the common-law cause of action for retaliatory discharge for whistle-blowing in New Mexico cannot rely on NMOHSA or OSHA or the regulations promulgated thereunder, the tort should not be recognized unless (1) the whistleblowing concerns a condition or practice that presents grave danger to health or safety. In addition, the whistleblower should not be entitled to common-law protection unless the whistleblower alleges and proves (2) that the allegation was made in good faith, (3) that there was an objectively reasonable basis for the allegation, and (4) that the allegation was made outside the company only after reasonable attempts to obtain relief internally.

Because Plaintiff's complaint does not allege any of the above four elements of the common-law cause of action, the complaint should be dismissed. If the complaint were not barred by accord and satisfaction, however, I would permit Plaintiff to amend the complaint. In this regard, it is important to note that it is not necessary that the allegation turn out to be true, assuming that even after exhaustion of reasonable internal reporting requirements, the worker could maintain a good faith, objectively reasonable belief in the allegation. Thus, Plaintiff is not barred by the apparent failure of the Bureau to agree with his complaint to the Bureau.[4]

---

4. The complaint filed in court alleges that Plaintiff filed a complaint with the Bureau because of a concern that headaches, aching chests, and swollen lips suffered by Defendant's employees were caused by chemical usage by Defendant. The Bureau citation listed several violations that it considered serious (resulting in a total fine of $360), but they related to storage of combustible

liquids and failure to guard machinery. The citation also mentioned certain violations that related to respirators and worker education re-

garding hazardous chemicals, but these were labeled "other than serious" and resulted in no fine to Defendant.