1998-NMCA-021

953 P.2d 1089

Mark E. WEIDLER, in his official capacity as Secretary of the New Mexico Environment Department, Respondent–Appellee,

v.

BIG J ENTERPRISES, INC.,
Petitioner–Appellant,

and

Matthew B. KEHOE, Plaintiff–Appellee/Cross–Appellant,

v.

BIG J ENTERPRISES, INC., Defendant–Appellant/Cross–Appellee.

No. 16712.

Court of Appeals of New Mexico.

Dec. 15, 1997.

Tom Udall, Attorney General, Geoffrey Sloan, Special Assistant Attorney General, New Mexico Environment Department, Santa Fe, for Respondent–Appellee.

Eric Scott Jeffries, Ripley B. Harwood, Jeffries & Rugge, P.C., Albuquerque, for Plaintiff–Appellee/Cross–Appellant.

Michael E. Vigil, William C. Marchiondo, Marchiondo, Vigil & Associates, P.C., Albuquerque, for Defendant–Appellant/Cross–Appellee.

## OPINION

ALARID, Judge.

1. Big J Enterprises (Big J) appeals a jury verdict, including punitive damages, for Matthew Kehoe (Kehoe) based on a claim of retaliatory discharge. Kehoe cross-appeals the trial court's ruling regarding prejudgment interest. We affirm the verdict and the award of prejudgment interest on the compensatory damages portion of the award.

## FACTS

2. Big J is a construction company owned by Gary Johnson and his wife, Dee. One of its largest customers is the Intel Corporation plant in Rio Rancho. In 1991, Big J employed approximately four hundred people, many of whom worked at the Intel site on various projects. The number of employees at the site would vary depending on the labor needs for the particular projects. In particular, the number of workers would fluctuate greatly during a shutdown. A "shutdown" refers to the time when the plant is not operational. It was during that time that maintenance and refurbishment of the plant's fabrication rooms would take place. As a result, Big J would add more employees to accommodate the increased workload. After every shutdown, once most of the work was

done, there would be a layoff by Big J. The leads or foremen of a particular crew would be responsible for recommending who should be laid off. However, management had the only authority to effect the layoffs. The Big J management team who could authorize layoffs at the Intel site included Jim Dorough, head of Fab 9; Rod Camplaign, head of Fab 7; and Jerry Hess, supervisor at Intel.

3. Kehoe began working for Big J at the Intel site in February 1991 as a licensed mechanical journeyman. He worked on a variety of projects involving ceilings and floors, sheet metal and fiberglass work. From February 1991 until October 1991, he reported to three different people, working on whatever project needed to be done. In October 1991, he was assigned to work under the supervision of Ray Saiz. It was while he was working under the supervision of Saiz that several incidents occurred involving Kehoe and what might be termed "safety concerns."

4. On December 13, 1991, during demolition and removal of duct work, in two separate incidents, several drops of sulfuric acid solution came in contact with Kehoe. Kehoe was wearing standard safety gear and no injury was reportedly suffered. However, Kehoe was required to replace the pair of work boots he was wearing because of contamination. Later that day, Saiz commented to others referring to the incidents as Kehoe getting "his first golden shower." Testimony classified the remarks as pornographic, connoting that Kehoe had been urinated on.

5. These remarks were repeated to Kehoe, who became upset and expressed concern about the nonchalant handling of the incidents. Kehoe talked to other workers that day about the incidents and his concerns. Over the weekend, Kehoe decided that he would bring up the jokes and the casual handling of the acid pipe on Monday, at the weekly safety meeting. In fact, Kehoe never spoke at the meeting. He testified that Saiz pulled him out of the meeting before he could do so and told him, for the first time, that his job was not secure. Kehoe accused Saiz of threatening his job because of the acid incidents. Saiz vehemently denied doing any such thing. During his testimony, Saiz denied that he called Kehoe out of the safety meeting. Saiz did acknowledge that he had heard from others that Kehoe was upset about the acid incidents. In fact, Kehoe's roommate testified that he told Saiz that Kehoe was going to report him to OSHA. Saiz denied that he had been told Kehoe was going to call OSHA; he testified that he recalled Kehoe was going to the union.

6. There was testimony that Saiz's attitude toward Kehoe changed after the acid spills and that the quality of work assigned to Kehoe was different. Kehoe testified that after the acid spills, Saiz assigned him to sorting nuts and bolts in the shop. This job was characterized as menial work for a journeyman. Kehoe apparently believed at that point that he was going to be laid off. Saiz testified that after the acid incidents, Kehoe's attitude and productivity declined. He testified that certain projects assigned to Kehoe had to be redone or were not completed in a timely manner. On December 30, 1991, Kehoe was punished for taking a break without getting permission from Saiz, although another member of the same crew was not punished. Kehoe was told to take the rest of the week off.

7. On December 31, 1991, Kehoe called OSHA and reported his concern about unsafe handling of sulfuric acid. That same day, Kehoe also called the Big J corporate office and spoke to the personnel manager. He claimed that he mentioned vaguely the problems he was having and wanted to know what the grievance procedure was. He testified that he never followed through because he was afraid of being fired.

8. During the December shutdown, Saiz had been notified by Dorough that he had to reduce his crew. Saiz testified that he compared the journeymen on his crew and decided that Kehoe was the least productive and would be the one to go. In a statement made to the OSHA investigator, Saiz admitted that he knew Kehoe was "in pursuit of this" at the time he decided to fire him. The investigator concluded that Saiz knew Kehoe was going to contact OSHA before he decided to terminate him. Saiz notified Dorough of his recommendation approximately one

week before Kehoe was laid off. Dorough approved the termination and the reasons advanced by Saiz for selecting Kehoe. On January 20, 1992, Kehoe was notified by Saiz that he was laid off. A termination form was faxed from Intel to the Big J office.

9. Kehoe met with Gary Johnson a few days later to express his concerns about the acid incidents and about his discharge. Johnson told Kehoe that it was a temporary layoff, that he appeared highly qualified and, thus, would be eligible for rehire. Sometime after the termination, however, a notation appeared on Kehoe's employee record stating "not eligible for rehire, see Gary." This notation was apparently made several weeks after Kehoe's discharge when it came to Johnson's attention that Kehoe had filed a workers' compensation claim against Big J.

10. At their meeting, Johnson told Kehoe that he would look into the acid incidents. In doing so, Johnson talked to Saiz and Hess, but to none of the workers who were present during the incidents. Johnson accepted Hess's evaluation that the incidents were a "piece of crap" and questioned whether they had even happened.

11. On January 27, 1992, Kehoe called OSHA again and complained that he had been laid off for raising safety concerns. Gary Ortiz, an OSHA investigator, met with Johnson that afternoon. Ortiz testified that Johnson told him that Kehoe had been laid off because he was the least qualified. However, in a letter written to OSHA by Johnson on February 10, 1992, he stated that Kehoe was laid off because he was the least productive. The letter further stated that no one was being hired to replace Kehoe. Nevertheless, three days before this letter was written, Big J had placed an ad soliciting mechanical journeymen. Within three weeks of Kehoe's termination, Big J had hired three new journeymen sheetmetal workers for Saiz's crew.

12. In July 1992, the Secretary of the Environment Department (the Department) filed a petition in district court claiming that Big J had violated NMSA 1978, § 50–9–25(A)(1993), by terminating Kehoe for raising safety concerns. The Department sought compensation and injunctive relief. In May 1993, Kehoe filed a complaint in the Bernalillo County District Court for wrongful termination, claiming retaliatory discharge for raising safety concerns. Big J denied all allegations. The two cases were consolidated in June 1993.

13. After a three-week trial, the jury returned a verdict against Big J, finding retaliatory discharge and awarding Kehoe damages, including punitive damages of $500,000. The trial court awarded injunctive relief on behalf of the Department. The trial court entered judgment, which included prejudgment interest only on the compensatory damages from the date Kehoe's complaint was served on Big J. Big J's motion for judgment notwithstanding the verdict or for a new trial was denied. Big J appealed the verdict. Kehoe cross-appealed the refusal to award prejudgment interest on the punitive damages award.

## JURY INSTRUCTIONS

14. Big J raises four issues relating to instructions given to the jury. The first concerns the general instruction, which explains the nature of the case and defenses and sets forth the elements of the claims. The second goes to the standard of knowledge required by the employer as it relates to the causal connection between the knowledge of protected activity and the discharge. The third concerns the trial court's failure to give Big J's requested instruction regarding Kehoe being an at-will employee. The fourth concerns the failure to give Big J's requested instruction defining the term "ratified." "When reviewing jury instructions given by the trial court, this Court must read and consider the instructions together to determine whether they fairly present the issues and the applicable law." *Vigil v. Miners Colfax Med. Ctr.*, 117 N.M. 665, 671, 875 P.2d 1096, 1102 (Ct.App.1994). If they do so, we will affirm.

15. Big J contends that the jury instructions setting forth the Department's and Kehoe's claims impermissibly created a private right of action under the OSHA anti-discrimination statute and allowed for double recovery. Big J objected to instructions numbered 28 and 31. Instruction 28 begins:

Matthew Kehoe, seek[s] damages from Big J for its violation of the Occupational Health and Safety Act and/or Retaliatory Discharge of Kehoe from his employment. The Secretary seeks injunctive relief for itself which may be awarded by the Judge, however, the Secretary requests that damages be awarded to Kehoe by the jury. The instruction then goes on to set forth the elements of the claims that: 1) Kehoe engaged in protected activity, raising safety concerns; 2) his supervisor either knew or suspected that Kehoe raised the safety concerns; and 3) this protected activity was a substantial or motivating factor in his discharge from employment. Instruction 31 sets forth the language of Section 50–9–25(A), which provides that "[n]o person or employer shall discharge or in any manner discriminate against any employee because the employee has filed a complaint or instituted or caused to be instituted a proceeding under [NMOHSA]." The jury was instructed that if it found "from the evidence that Big J violated this statute in its discharge of Matthew Kehoe, then Big J's conduct constitutes retaliatory discharge."

■ 16. Big J argues that Instruction 31, which recites the anti-discrimination statute and then states that if it has been violated, retaliatory discharge has been proven, creates a private right of action for violation of the statute. Relying on federal authority interpreting the FedOSHA statute, Big J argues by analogy that no private right of action has been created for violation of the anti-discrimination provision of NMOHSA. *See George v. Aztec Rental Ctr., Inc.*, 763 F.2d 184, 186 (5th Cir.1985); *Taylor v. Brighton Corp.*, 616 F.2d 256, 264 (6th Cir. 1980). When the federal courts speak of no private right of action, what they mean is that the administrative remedy provided in 29 U.S.C. § 660(c) (1985), is the sole remedy available to an employee under federal law for violation of the anti-discrimination statute. Thus, if the Secretary of Labor refuses to pursue a claim on behalf of the discharged employee, the employee himself may not file a complaint for violation of FedOSHA. However, nothing in the FedOSHA prohibits an employee from filing a common-law tort claim for retaliatory discharge or an action

based upon a contract theory. *Cerracchio v. Alden Leeds, Inc.*, 223 N.J.Super. 435, 538 A.2d 1292, 1298 (App.Div.1988); *Lepore v. National Tool & Mfg. Co.*, 224 N.J.Super. 463, 540 A.2d 1296 (1988). Nor was FedOSHA designed to preempt any common-law remedies workers might have under state law. *Kilpatrick v. Delaware County S.P.C.A.* 632 F.Supp. 542, 548 (E.D.Pa.1986).

17. Similarly, in *Gutierrez v. Sundancer Indian Jewelry, Inc.*, 117 N.M. 41, 43, 868 P.2d 1266, 1268 (Ct.App.1994), this Court held that NMOHSA did not provide the exclusive remedy for a discharge from employment because of the reporting of safety concerns. This Court determined that because the common law provided a duty to provide a safe workplace, NMOHSA merely codified and detailed the scope of that duty and that codification did not abolish the common-law action. *Id.* at 48, 868 P.2d at 1273. Therefore, an employee could file a complaint stating a common-law cause of action for his unlawful discharge. New Mexico thus recognizes an employee's right to institute a private cause of action, not seeking enforcement of the statute as such, but to enforce his common-law right not to be discharged for reporting unsafe practices in the workplace. *See Reed v. Municipality of Anchorage*, 782 P.2d 1155 (Alaska 1989).

■ 18. The claim for retaliatory discharge requires an employee to show that he was discharged because he performed an act that public policy authorizes or encourages. *Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 647, 777 P.2d 371, 375 (1989). Thus, "[t]he linchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy.'" *Shovelin v. Central N.M. Elec. Coop.*, 115 N.M. 293, 303, 850 P.2d 996, 1006 (1993) (citation omitted). One source we look to for statements of public policy is legislation. *Id.; National Trust for Historic Preservation v. City of Albuquerque*, 117 N.M. 590, 593, 874 P.2d 798, 801 (Ct.App.1994) ("[A] common-law court may utilize the statute solely to demonstrate what is public policy; that public policy then forms the predicate for a common-

law cause of action."). Thus, if there is a statute prohibiting certain actions, we view that as a statement of public policy which may be used to support the common-law cause of action. *See Gandy v. Wal–Mart Stores, Inc.,* 117 N.M. 441, 442–44, 872 P.2d 859, 860–62 (1994); *Michaels v. Anglo Am. Auto Auctions, Inc.,* 117 N.M. 91, 92–93, 869 P.2d 279, 280–81 (1994). Instruction 31 quoted NMOHSA as a statement of public policy whose violation may be used to establish a retaliatory discharge. We find no error in instructing the jury that violation of this statute resulted in retaliatory discharge.

■ 19. Big J's argument regarding double recovery appears to be based on the introductory paragraph of Instruction 28, which told the jury that Kehoe was seeking damages for violation of the NMOHSA and/or retaliatory discharge, that the Secretary was requesting injunctive relief that would be awarded by the judge, but the Secretary was also requesting that damages be awarded to Kehoe. Big J argues that the "and/or" language allowed the jury to award damages for either violation of the statute or retaliatory discharge or both, thus allowing for the possibility of double recovery. We disagree.

20. This case presented two bases for recovery for wrongful discharge by two different parties. The Department sought reparation under the statute on behalf of itself and the employee. Thus, its complaint sought "to restrain the violation ... and for other appropriate relief including rehiring or reinstatement of the employee to his former position with back pay." Section 50–9–25(B). We note that under the federal counterpart "all appropriate relief" has been interpreted to include exemplary damages. *See Reich v. Cambridgeport Air Sys., Inc.,* 26 F.3d 1187, 1190–91 (1st Cir.1994). Kehoe sought damages, including punitive damages, under the tort of wrongful discharge. The two causes of action were consolidated without objection as there were elements common to the two claims. Although ordinarily the Department's claim would not be triable to a jury, here, the judge informed the parties that it was "going to use the jury as an advisory fact finder for the basis of either issuing or not issuing injunctive relief or relief that is permitted under the statute." Where there are factual matters common to both equitable and legal claims, the trial court may utilize the jury as an advisory fact finder. Rule 1–039(B), NMRA 1997. Defendant did not voice a timely objection to the trial court's announcement of the use of the jury in an advisory capacity to decide the claims pursued by the Department. *See Scott v. Woods,* 105 N.M. 177, 184, 730 P.2d 480, 487 (Ct.App.1986). Here, the jury was instructed to consider and determine the three factual elements that were common to the two claims. It was further instructed that Kehoe also had the burden of showing that the discharge was the proximate cause of his damages and what damages he suffered.

21. We do not believe that this is a case where the jury has been presented one improper issue and one proper issue and it is impossible to determine whether the jury's verdict was based on the improper one. In light of the fact that the trial court indicated that it would submit the claim sought by Kehoe to the jury and would submit the Department's claim to the jury in its advisory fact-finding capacity, any use of the term "and/or" in the instruction was harmless under the circumstances presented here. The amended final order and judgment on the jury verdict clearly reflects that the trial court carefully reviewed the special interrogatories and jury verdict and that no double recovery occurred.

■ 22. As we pointed out earlier, we must review the jury instructions to determine whether, as a whole, the instructions properly present the case and the law to the jury. We do not focus on a few words in one instruction to the exclusion of all other instructions, but rather review those words in light of the other instructions.

23. Here, all the instructions, including the special interrogatories and verdict, indicate that the jury was properly instructed that the Department and Kehoe sought relief from Big J for its unlawful discharge of Kehoe for engaging in "protected activity." The basis of liability either statutory or common law, would be established by the finding of the same elements i.e., 1) proof that the

employee was discharged because he performed an act that public policy has authorized or encouraged, or that the employee refused to do something that public policy condemns; 2) that the employer knew or suspected that the employee's action involved a protected activity; 3) that there was a causal connection between the employee's protected actions and the employer's act of discharging him; and 4) that the employee suffered damages thereby. *See Shovelin,* 115 N.M. at 303, 850 P.2d at 1006; *Chavez,* 108 N.M. at 647, 777 P.2d at 375; *see also Reich v. Hoy Shoe Co.,* 32 F.3d 361, 367 (8th Cir.1994). Once the jury found the common elements, Kehoe alone was required to prove his damages and that those damages were caused by the unlawful discharge. The jury was required to find that Kehoe lost earnings, that he suffered emotional distress, and that the termination was willful, wanton, reckless or malicious. There was no indication in any of the other instructions that the Department was required to prove damages for Kehoe. Thus, we fail to see how, in light of the remainder of the instructions, the jury was encouraged to award double recovery.

■ 24. Moreover, we will not reverse a jury verdict based on speculation regarding what the jury could have done. *See Segura v. Molycorp, Inc.,* 97 N.M. 13, 19, 636 P.2d 284, 290 (1981) (harmless error to fail to instruct jury to confine itself to either damages on a contract theory or damages on a tort theory where no judgment for multiple damages was awarded). We think it is highly speculative to say that the jury would award double damages because the Department requested damages in connection with Kehoe, where the special interrogatories to the jury made it clear that it was only to decide damages on behalf of Kehoe's tort claim. Further, it is clear from the answers to the interrogatories and the verdict in light of the evidence concerning damages that the jury did not award double recovery. We believe that fact alone cures any possibility of harm in the jury instructions.

■ 25. As we recently pointed out in *Lihosit v. I & W. Inc.,* 1996 NMCA 033, 121 N.M. 455, 458, 913 P.2d 262, 265, "the employer's motive is a key element of retaliatory discharge." Clearly, "'an employer cannot fire an employee in retaliation for actions of which the employer is unaware.'" *Id.* (citation omitted). However, actual knowledge of the protected activity is not required. As the court in *Reich,* 32 F.3d at 368 stated:

> [C]ommon sense and experience establish that employers ... make employment decisions on what they suspect or believe to be true. It would be a strange rule, indeed, that would protect an employee discharged because the employer actually *knew* he or she had engaged in protected activity but would not protect an employee discharged because the employer merely *believed* or *suspected* he or she had engaged in protected activity.

We agree that there must be some evidence that the employer was aware, either by suspicion or actual knowledge, of the protected activity. A discharge based on a belief or suspicion of protected activity is just as reprehensible as a discharge based on actual knowledge of protected activity. Thus, the jury was correctly instructed that the law does not require actual knowledge of the protected activity.

■ 26. Big J contends that the trial court erred in refusing to give its requested instruction that Kehoe was an at-will employee. The purpose of the instruction was to inform the jury that Big J could terminate Kehoe for any reason other than raising safety issues or for no reason at all. The instruction was not necessary, as the jury had already been instructed that Kehoe was an at-will employee, meaning that he could be terminated for any reason or no reason, so long as he was not terminated for engaging in protected activity. It is not error for the trial court to refuse to give Defendant's instruction, where the jury was already instructed on the matter. *See Kestenbaum v. Pennzoil Co.,* 108 N.M. 20, 28–29, 766 P.2d 280, 288–89 (1988) (where the court gave instructions that adequately covered the issue, it is not error to deny requested instructions).

■ 27. Big J also contends that the jury should have been instructed on the meaning of the term "ratified." The term

was used in the interrogatory on punitive damages. Interrogatory No. 7 asked:

> Did a Big J employee with managerial capacity participate in, ratify, or authorize Matthew Kehoe's discharge?
>
> . . . .
>
> If you answer "Yes" to Question 7, you shall proceed to determine the amount of money necessary to punish Big J for its actions in accordance with the Court's instructions on punitive damages, and you shall enter the amount where indicated below.
>
> If on the other hand you answer "No" to Question 7 you are not to consider punitive damages.

Big J argues that the jury needed to be instructed that ratification required that a managerial employee approved Kehoe's termination because he raised safety concerns. Definitional instructions need not be given when the term is one of common understanding. *See State v. Gonzales*, 112 N.M. 544, 553, 817 P.2d 1186, 1195 (1991). We believe that the term "ratify" is one of common understanding and, as it was used here in conjunction with other terms suggesting agreement to the conduct, did not need to be defined for the jury.

28. We find no error in the trial court's instructions to the jury. Viewing the instructions as a whole, we find that they correctly present the issues and applicable law in this case.

## SUFFICIENCY OF THE EVIDENCE

29. Big J contends that there was insufficient evidence to support the jury's determination that Kehoe's raising of safety concerns was a substantial or motivating factor in his termination. It further contends that there was insufficient evidence to support the award of compensatory damages. Initially, we note Plaintiffs' argument that Big J failed to properly preserve the sufficiency issues, since it failed to move for a directed verdict at the close of evidence. *See First Nat'l Bank in Albuquerque v. Sanchez*, 112 N.M. 317, 319–20, 815 P.2d 613, 615–16 (1991). We find that sufficient objection was made to the giving of certain jury instructions because of the lack of evidence to preserve the issue of

sufficiency of the evidence. *Id.* at 320, 815 P.2d at 616.

30. In reviewing a sufficiency of the evidence claim, this Court views the evidence "in a light most favorable to the prevailing party and disregard[s] any inferences and evidence to the contrary." *Montoya v. Torres*, 113 N.M. 105, 109, 823 P.2d 905, 909 (1991). "[I]t is the province of the jury to determine the credibility of witnesses, reconcile inconsistent or contradictory testimony, and determine where the truth lies." *Beavers v. Johnson Controls World Servs., Inc.*, 120 N.M. 343, 352, 901 P.2d 761, 770 (Ct.App. 1995). We simply review the evidence to determine whether there is evidence that a reasonable mind would find adequate to support a conclusion. *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990).

31. Direct evidence of an employer's motive will be rare, as an employer will rarely admit to retaliatory intent. We have often stated that intent ordinarily may not be proven directly. However, a person's intent can be inferred from surrounding circumstances. *See Behrmann v. Phototron Corp.*, 110 N.M. 323, 324, 795 P.2d 1015, 1016 (1990). It is well established that discrimination can be proven by either direct or indirect evidence. *See Smith v. FDC Corp.*, 109 N.M. 514, 519, 787 P.2d 433, 438 (1990). Therefore, Kehoe could show by indirect or circumstantial evidence that his discharge was motivated by the reporting of safety concerns.

32. Kehoe presented evidence of threats, confrontations, and assignment to menial tasks by his supervisor when he began expressing concerns about safety after the acid spill incidents. Further, there was evidence that Big J's assertion regarding the reason for Kehoe's termination was pretextual. Saiz, Kehoe's supervisor, stated that Kehoe was lazy and the least productive member of his team, and thus, when told to reduce his team, he determined that Kehoe should go. Evidence showed, however, that the only performance evaluation that Kehoe received indicated that he was an excellent worker. Further, others who observed his work testified that he did good work. There was noth-

ing in Kehoe's personnel file showing progressive discipline, even though Saiz testified that there had been problems for months with his work and Big J's personnel policy required progressive discipline in such instances. The only written negative comment came from LaNoue and was written a day after Kehoe's termination at the request of Saiz and Dorough. Additionally, there was evidence that Big J was advertising for licensed journeymen mechanical workers within days after Kehoe was discharged and had hired several within a few weeks after his discharge. Thus, the jury could infer that the claimed reduction in the Big J workforce and the claim that Kehoe was the least productive member of the crew were a pretext for Kehoe's discharge.

33. Further, evidence was presented regarding an environment at Big J that was not tolerant of the reporting of safety concerns. Many testified that the phrase "you talk, you walk" applied at Big J. Apparently, the word throughout the company was "don't make waves." There was testimony regarding an incident where a worker brought up a safety concern at a safety meeting after which management was heard to say "he's out of here." That worker was laid off after shutdown. Another worker who had been burned by an unknown chemical was told to drop it or he would lose his job when he attempted to learn what burned him. With regard to Kehoe, himself, he was told to mind his own business when he had suggested a safer means of moving a 2000–pound air handler.

34. Big J argues that there was no evidence that those with authority to fire employees knew or believed that Kehoe had been raising safety issues. Relying on *Lihosit*, Big J argues that because it did not know, the causal connection is missing and Kehoe cannot show a retaliatory motive for his discharge. While we agree with the holding in *Lihosit*, that the person responsible for the discharge must have some knowledge, belief or suspicion that the employee engaged in protected activity, we do not believe that the facts in this case establish that the person responsible for the discharge had no knowledge of the protected activity.

35. Big J argues that Saiz had no authority to fire Kehoe, that his only authority was to make a recommendation to Dorough regarding who would be terminated. While it is true that Saiz had no authority to actually fire someone, he was responsible for the discharge as he was the one making recommendations regarding who to terminate. Further, the evidence showed that Dorough accepted his recommendations without discussion. Where, in *Lihosit*, we would not impute the knowledge of the dispatcher regarding why Lihosit would not drive for the employer, here we believe that Saiz's knowledge regarding Kehoe's complaints about safety can be imputed to Dorough and thus, the company. In *Lihosit* the dispatcher had no involvement in Lihosit's termination. Here, Saiz was intimately involved with Kehoe's termination, as he was the one who recommended it. This is not a case where those involved in the termination had no knowledge of the protected activity. Rather, the evidence establishes that those who actually made the determination to release Kehoe knew about his expression of safety concerns and his threat to report them to either NMOHSA or his union, either of which is protected activity.

36. Thus, there was sufficient evidence to support the element of knowledge on the part of the employer of the employee's protected activity. In addition to the evidence of knowledge on the part of Big J, there is evidence of a hostile environment regarding reporting of safety concerns as well as evidence that Big J's reasons for Kehoe's firing were pretextual. We find that there was sufficient evidence to support the jury's determination that Kehoe's reporting of safety concerns was a motivating factor in his termination.

37. Big J argues that there was insufficient evidence to support the compensatory damages award because Kehoe's calculation of lost wages was based solely on speculation and there was no evidence of severe emotional distress. Case law does not require absolute certainty in making a lost-wage determination in employment discrimination cases. *See Smith*, 109 N.M. at 520, 787 P.2d at 439. Once evidence of damages

is presented, the employer, not the employee, bears the burden of uncertainties in the calculations. *Id.* at 521, 787 P.2d at 440.

38. Here, Kehoe proved that he lost wages; he was not working. There was evidence regarding what other similarly situated employees at Big J earned between the time of Kehoe's discharge and the time of trial. This evidence showed increases in salary equivalent to a dollar an hour or more every six months. Kehoe then presented a reasonable formula for calculating what he had lost. He took the amount that he actually made in a six-month period at Big J and added a dollar an hour raise for every six months that he would have been there. Then he subtracted the amount he was paid by Big J for January and February of 1992 and the amount he actually earned from other work during 1992 and 1993 until October when he got a regular job. Kehoe testified to a loss of $54,000 in wages. The jury awarded $50,000. We find substantial evidence to support the award for lost wages.

39. In addition to the damage award for lost wages, the jury also awarded Kehoe $10,000 for emotional distress. Big J contends that there was no evidence of severe emotional distress. The record shows that Kehoe went to see a counselor after he was laid off to help him deal with his anger at Saiz and his feelings of being victimized. The therapist testified regarding Kehoe's anxiety, distress, and physical weight loss after his discharge. Also, Kehoe's fiancé testified regarding his fragile physical and mental condition after the discharge. No evidence was presented to rebut this testimony. Thus, there was clear, uncontradicted testimony regarding Kehoe's emotional distress after his discharge.

40. Viewing the evidence as we do in favor of the prevailing party below, we conclude that there was sufficient evidence, both direct and circumstantial, from which a reasonable jury could determine that Kehoe was discharged because he raised safety concerns and that he suffered damages in the form of lost wages and emotional distress from that discharge.

## PUNITIVE DAMAGES

41. Finally, Big J contends that the punitive damages award should be set aside. It advances two bases for doing so, that: 1) there was insufficient evidence to show that Big J management either authorized or participated in or ratified Kehoe's discharge for engaging in "protected activity," and 2) the amount of the award is excessive.

42. The purpose of punitive damages is to punish conduct and to deter others from similar conduct. *See McGinnis v. Honeywell, Inc.*, 110 N.M. 1, 9, 791 P.2d 452, 460 (1990). Also, it is well established "that a principal may be held liable for punitive damages when the principal has in some way authorized, ratified, or participated in the wanton, oppressive, malicious, fraudulent, or criminal acts of its agent." *Albuquerque Concrete Coring Co. v. Pan Am World Servs., Inc.*, 118 N.M. 140, 143, 879 P.2d 772, 775 (1994). Further, punitive damages may be awarded against the principal because of the act of an agent if the agent was employed in a managerial capacity and was acting in the scope of his employment. *Id.* at 145, 879 P.2d at 777. Big J argues that there was a total lack of evidence that anyone at Big J with managerial authority authorized, ratified, or participated in the termination of Kehoe for raising safety issues. We cannot agree.

43. Big J focuses on the managerial authority of Saiz. It contends that he had no hiring or firing authority and that he had to get the approval of his supervisor, Dorough, to discharge Kehoe. As was pointed out in *Albuquerque Concrete*, the determination regarding whether an employee acts in a managerial capacity does not necessarily hinge on his or her level in the corporate hierarchy. " 'Rather, the critical inquiry is the degree of discretion the employee[] possess[es] in making decisions that will ultimately determine corporate policy.' " *Id.* (citation omitted). The key is to look at "whether the individual has discretion regarding both what is done and how it is done." *Id.* We believe that a jury could reasonably infer that Saiz had some management authority since his recommendations regarding personnel were taken on face value without any questions. Fur-

ther, there was evidence that Saiz's actions were inconsistent with corporate policy that non-management employees had no discretion. Saiz failed to follow the policy regarding progressive discipline. Additionally, he used his own discretion in determining whom to discipline and whom not to for the same infractions. Moreover, he used his own discretion in determining which employees would be laid off and for what reasons. In fact, it appears that Saiz had wide discretion in the management of his crew, determining who should do what, when, and how, and in determining who would be laid off, for what reasons, and whether they should be eligible for rehire. We think that the jury could have found that Saiz had a degree of managerial capacity, sufficient to hold the corporation liable for his termination of Kehoe. *See id.* at 145–46, 879 P.2d at 777–78.

44. Even assuming arguendo, however, that Saiz was not a management level employee, the record contains evidence to support the jury's determination that the corporation is liable for Kehoe's wrongful discharge. Gary Johnson, the president of Big J, knew that there were safety concerns involved in Kehoe's termination. Kehoe told him so. Further, Johnson apparently investigated the incidents that had raised the safety concerns and determined that they were groundless, without speaking to those who were actually present at the time. Additionally, Johnson confirmed Saiz's recommendation of "do not rehire." Johnson's reason, however, was because Kehoe had filed a workers' compensation claim, not because he was an unsatisfactory worker. Further, Johnson acknowledged in a letter to OSHA that Kehoe's termination was a management decision. Since management's stated reason for the termination was found to be a pretext, the jury could infer that the corporation either approved or participated in the termination for expressing safety concerns. This determination is further supported by the evidence presented at trial that there was an atmosphere within the corporation that discouraged the expression of safety concerns. The jury could reasonably infer from this evidence a corporate policy regarding those who have expressed safety concerns. We

find that there was sufficient evidence of corporate culpability in the discharge of Kehoe because he expressed safety concerns. This culpability supports an award of punitive damages against the corporation.

45. Big J contends that the amount of punitive damages is excessive. "The amount of punitive damages is left to the discretion of the trier of fact, based on the circumstances of each case, but should not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason and justice." *Downs v. Garay,* 106 N.M. 321, 324, 742 P.2d 533, 536 (Ct.App.1987). This Court will rarely disturb a punitive damages award.

46. Big J urges this Court to follow the framework set out in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), for analyzing an award of punitive damages. This analysis requires the Court to look at 1) the degree of reprehensibility of the conduct; 2) the ratio of the punitive award to the actual harm inflicted on plaintiff; and 3) a comparison between the punitive award and other sanctions that could be imposed for comparable misconduct. *Id.* at 573–577, 116 S.Ct. at 1598–1600. Big J argues that under that analysis the award here violated due process and should be set aside as excessive. We disagree. Assuming, without deciding' that we would follow the framework set forth in *BMW,* we believe that the award here does not require reversal.

47. As the Supreme Court in *BMW* notes, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575, 116 S.Ct. at 1599. Although Big J argues that there was no reprehensible conduct on its part, we believe that discharging an employee for reporting safety concerns is particularly reprehensible. The health and safety of others is put at risk when it is clear that the reporting of safety hazards can cost a person his or her job. Here, where there was evidence of a pattern of threatening employees with their

jobs over the raising of safety concerns, the jury could reasonably conclude Big J was engaging in particularly reprehensible conduct. An indifference to or reckless disregard for the health or safety of others is an aggravating factor for punitive damages. *Id.* at 575 n. 23, 116 S.Ct. at 1599 n. 23. Likewise, evidence of repeated engagement in prohibited conduct knowing or suspecting it is unlawful is relevant support for a substantial award. *Id.* at 575, 116 S.Ct. at 1599–1600. We think the evidence here shows conduct reprehensible enough to support a punitive damages award. Further, the degree of reprehensibility supports a substantial award.

48. Second, the ratio of punitive damages to actual damages here is eight to one. In economic injury cases, if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally should not exceed ten to one. *See Continental Trend Resources, Inc. v. OXY USA Inc.,* 101 F.3d 634, 639–40 (10th Cir.1996). The inference is that in those cases where there is harm to health and safety, the ratio might be much higher. *Id.* Further, in a case such as this where the injury is difficult to quantify, the disparity in the ratio can be larger to satisfy the injury. *See BMW,* 517 U.S. at 581, 116 S.Ct. at 1602; *Downs,* 106 N.M. at 324–25, 742 P.2d at 536–37. We do not believe that the ratio here of eight to one is impermissibly large. It falls well within the ratios contemplated by the court in *BMW.*

49. Finally, the fact that repeated violations of OSHA may result in a civil penalty of no more that $70,000 for each violation does not aid Big J. If this were the only factor we were to consider, we would have to agree with Big J that the punitive damages award was excessive. This is, however, only one of several factors to be considered. The other two, in particular the first, lean against Big J. Analyzing this issue pursuant to the framework of *BMW,* we hold that the punitive damages award is not excessive.

50. Further, there is no claim here that Big J is unable to satisfy the judgment and that the award is grossly disproportionate to its wealth. There was a good deal of evidence that the company had grown substantially in the early 1990s, nearly doubling in size. Gross receipts had increased from fifteen million dollars in 1992 to twenty-eight million dollars in 1993. We cannot say the jury acted improperly in exercising its community judgment regarding the value of the wrongful act of discharging Kehoe for raising safety concerns. Thus, we cannot say the award is excessive.

## CROSS–APPEAL

51. Kehoe appeals the trial court's refusal to award prejudgment interest on the punitive damages portion of his award and its refusal to award prejudgment interest from the date the Department had served its complaint on Big J. The trial court determined that "Kehoe is not legally entitled to prejudgment interest on the amount of punitive damages." It awarded prejudgment interest on the compensatory damages award from the date of Kehoe's complaint.

52. We agree with the trial court that Kehoe was not legally entitled to prejudgment interest on the punitive damages portion of his award. Prejudgment interest is authorized by NMSA 1978, § 56–8–4(B) (1993). The award is discretionary with the trial court after it considers two factors: 1) whether the plaintiff was the cause of unreasonable delay, and 2) whether the defendant had made a reasonable and timely offer of settlement. The Supreme Court in *Sunwest Bank N.A. v. Colucci,* 117 N.M. 373, 378, 872 P.2d 346, 351 (1994), stated that the purpose of allowing prejudgment interest under this statute was as a management tool "to foster settlement and prevent delay in all types of litigation." Thus, prejudgment interest is an award to discourage recalcitrance and unwarranted delays in cases which should be more speedily resolved; an award to ensure that just compensation to the tort victim is not eroded by the dilatory tactics of the tortfeasor. Therefore, it is in the nature of a sanction wholly separate from any punitive damages awarded. *See Digital & Analog Design Corp. v. North Supply Co.,* 63 Ohio St.3d 657, 590 N.E.2d 737, 741 (1992).

53. Punitive damages are for the purpose of punishment and deterrence. *State ex rel.*

*New Mexico Highway and Transp. Dep't v. Baca,* 120 N.M. 1, 7, 896 P.2d 1148, 1154 (1995). By their very nature they are a windfall conferred upon an otherwise fully compensated plaintiff. *Id.* The effect of allowing prejudgment interest on punitive damages would be to compound that recovery. Since the jury has already fixed the amount of damages deemed to be an appropriate penalty, to allow interest on that amount would be "nothing more than an arbitrary award of punitive damages over and above the amount determined by the court to be appropriate punishment." *Colodonato v. Consolidated Rail Corp.,* 504 Pa. 80, 470 A.2d 475, 479 (1983). Adding prejudgment interest to a punitive damages award would change what the jury determined to be appropriate punishment and, thus, undermine the principles of punitive damages.

54. Prejudgment interest pursuant to Section 56–8–4(B) could be viewed as compensatory; that is, it " 'is awarded to indemnify the plaintiff for the loss of earnings on that money due to its delayed payment.' " *Seaward Const. Co. v. Bradley,* 817 P.2d 971, 975 (Colo.1991)(en banc) (citation omitted). Thus, prejudgment interest on a compensatory damages award is necessary to make the plaintiff whole, because the damages to which he was entitled to compensate for his loss were not received until long after the injury occurred. If prejudgment interest is viewed as compensatory in nature, then it cannot be awarded on punitive damages since that would go against the underlying principles of punitive damages.

55. Regardless of whether we view prejudgment interest under Section 56–8–4(B) as compensatory or not, we do not believe that punitive damage awards are subject to this interest. Therefore, we agree with the trial court that Kehoe was not entitled to prejudgment interest on the punitive damages portion of his award.

56. Kehoe also argues that the award of prejudgment interest should be from the date that the Department's complaint was served on Big J. Relying on *Lucero v. Aladdin Beauty Colleges, Inc.,* 117 N.M. 269, 871 P.2d 365 (1994), he argues that

because the two complaints were nearly identical, the interest should run from service of the first. We do not find *Lucero* dispositive in this case. In that case, the plaintiff had filed a complaint with the Human Rights Commission. After a decision at that level, she appealed to the district court. The trial court awarded her prejudgment interest from the date that the complaint was filed at the commission level. The reason for the award from that date was because the defendant could have avoided all interest penalties by a timely and reasonable offer to settle. *Id.* at 272, 871 P.2d at 368.

57. Here, however, there are two different parties seeking different remedies from the same defendant. Kehoe argues that the same case management purpose would be fulfilled here and that any reasonable offer to settle made by Big J would have terminated the case. We do not agree. If Big J would have settled with the Department, Kehoe could have continued with his case. Likewise, if Kehoe had settled, the Department could have continued with its case. Because there were two parties seeking different remedies, we do not believe that this case is governed by *Lucero.* If found to be appropriate, prejudgment interest on the monetary award to Kehoe should run from the time that his complaint was served on Big J.

**CONCLUSION**

58. We find that there was no error in the trial court's instructions to the jury. Further, the jury's verdict is supported by substantial evidence and the amount awarded for punitive damages is not excessive. The jury's verdict is affirmed. The trial court's determination regarding prejudgement interest is affirmed. It shall run on the compensatory damages award from the date of the service of Kehoe's complaint on Big J.

59. **IT IS SO ORDERED.**

DONNELLY and BUSTAMANTE, JJ., concur.